## JACOB JALMER MAKI *v.* CITY AND COUNTY OF HONOLULU.

### No. 2154.

ARGUED AUGUST 31, 1934.                    DECIDED OCTOBER 15, 1934.

COKE, C. J., BANKS AND PARSONS, JJ.

168

In the early morning of April 6, 1933, the plaintiff appellee, Jacob Jalmer Maki, a mechanic in the United States Navy, while driving his automobile along what is known as Ala Wai in the city of Honolulu, collided with the rear end of a garbage truck owned by the City and County of Honolulu and operated at the time by its employees. Accompanying the plaintiff in his automobile at the time were two friends, namely, Brown and Sands, both also of the Navy. Plaintiff's car was utterly demolished and he received injuries about the head and face including deep lacerations of the right side of the nose, which continued down through his upper lip with complete separation of the lip, ragged lacerations which extended from the right side of the nose through the right cheek to the corner of the mouth, compound fracture of the jaw, also a fracture of the base of the coronoid process of the jaw bone and a horizontal fracture of the ridge of the bone containing the teeth, which completely displaced six teeth. Plaintiff's companions were less seriously injured. Plaintiff was, for a long period of time, confined to a hospital under medical treatment, and, while escaping death, is permanently impaired and disabled by reason of the injuries sustained. The truck in question is of steel construction, weighing about six and a half tons, seven feet three inches high, seven feet eleven inches wide and twenty-four feet long and at the time of the collision was loaded with rubbish weighing approximately three tons. It was being operated at the time under the superintendent of garbage collection and disposal and of street cleaning, an

office created by the city board of supervisors under the authority conferred upon it by section 1738, R. L. 1925. It appears that the crew was collecting rubbish along what is known as the Kaimuki-Kapahulu route and having loaded the truck was proceeding toward the city incinerator at Kewalo and after traveling along Ala Wai for a distance, the driver of the truck discovering that his gas supply was exhausted, parked the truck on the street. Leaving the truck in charge of two of the truck crew the driver, with a fourth employee, proceeded on foot some distance in order to obtain a supply of gasoline. While the truck was thus parked in the street the collision occurred; the street at this point is approximately forty-four feet wide; the plaintiff came from behind the truck, traveling in the same direction, the collision taking place about one o'clock in the morning.

Subsequently the plaintiff made demand upon the city and county for compensation for the damages sustained by him and upon this demand being refused he instituted an action in the circuit court of the first judicial circuit to recover for his personal injuries and the damages to his automobile. The defendant, through the city and county attorney, interposed a demurrer to plaintiff's amended complaint on the ground that the defendant is not liable for the alleged negligence of its employees while performing a governmental function, it appearing affirmatively in said amended complaint that the defendant was performing such function at the time of the collision. The demurrer was overruled by the court and the defendant thereupon entered a general denial including therein a notice of its intention to rely upon the illegality of plaintiff's claim. The cause thereupon went to trial before a jury and resulted in a verdict in favor of the plaintiff and against the defendant assessing his damages in the sum of $8,307.50. The city and county attorney interposed an exception to

the verdict and filed a motion for a new trial, which was denied by the trial court. The cause now comes to this court on appeal by defendant's bill of exceptions.

The bill contains six separate exceptions but these may be condensed into three questions for the consideration of this court, the first of which is that the plaintiff was guilty of contributory negligence and therefore the negligence or carelessness of the defendant was not the proximate cause of plaintiff's injury. The second point made by defendant in the bill of exceptions is that the amount of the damages awarded to plaintiff is excessive. Defendant, however, has refrained from pressing this exception and we assume it has been abandoned by it; and finally it is urged by the defendant that the verdict and judgment are contrary to law because "the defendant, a municipal corporation, is not liable for negligence of its employees in the performance of a governmental function."

The evidence presented at the trial is in sharp conflict and disagreement in reference to the events leading up to and which occurred at the time of the collision. The plaintiff testified and was generally supported in his statements by both Brown and Sands that he was driving along Ala Wai just prior to the collision at a rate of between thirty and thirty-five miles an hour; that when about fifty feet from the truck he observed the same standing in the street without rear lights and some eight to ten feet to the left of the curb; that he put on his brakes and did everything a reasonable and prudent man could do to avoid the collision but was unable to do so, and collided with the rear end of the truck, receiving the injuries of which he complains. The impact of the collision propelled the truck along the road for approximately fifty feet. The employees of the city and county testified that the truck was parked three or four feet to the left of the curb and witness Eddie Lau, the driver, testified that the head and tail

lights were on at the time he left the truck in quest of gasoline and witness Kapeliela testified the tail lights were on shortly after the accident. Mr. Pence, another witness, testified that he arrived at the truck about five minutes after the accident and found the tail lights burning. The statement of the plaintiff and his witnesses of the rate of speed plaintiff's car was traveling immediately before the accident is also disputed by the testimony of witnesses Sills and Rogelio. On this contradictory testimony of the witnesses these issues were submitted to the jury and they passed upon them favorably to the plaintiff. It was within their province to do so.

This court, by an unbroken line of decisions, has established the rule that the verdict of the jury on controverted questions of fact will not be set aside by this court if there was substantial evidence to support the verdict; that questions relating to the credibility of witnesses and the weight of evidence are for the jury alone to decide and it is beyond the scope of this court's power to disturb the findings of the jury rendered under those circumstances. One of the early cases announcing this rule is *Bryne* v. *Voeller,* 13 Haw. 494. (See also *Tibbets* v. *Pali,* 14 Haw. 517; *Darcy* v. *Harmon,* 30 Haw. 12.) The same rule applies to decisions of circuit judges, jury waived. (See *Hewahewa* v. *Lalakea,* 27 Haw. 544.)

Confronted with this contradictory testimony the jury was free to resolve the questions in favor of either the plaintiff or the defendant. It chose the former course and we are unwilling to usurp the functions of the jury by withdrawing from its consideration one of the questions of fact which it was impaneled to decide.

Defendant's exceptions present the further question to be determined by this court, namely, whether the verdict and judgment should be set aside because of the rule that a municipal corporation is not liable in an action for dam-

ages for the negligence or tort of its officers, agents or employees, committed while in the exercise of what is known as a governmental function, as distinguished from corporate or ministerial activities. This rule of immunity is founded upon an ancient fiction of the law. It is a rudimentary survival of the maxim "the king can do no wrong," and has little aside from its antiquity to commend it. Many courts and law writers have expressed keen dissatisfaction with the rule, but it has the sanction of the Federal Supreme Court as well as of this court and is the law of our jurisdiction and can only be changed or modified by legislation. (See *Harris* v. *District of Columbia*, 256 U. S. 650; *City of Trenton* v. *New Jersey*, 262 U. S. 182.) The supreme court of Hawaii has considered the question in a number of decisions, namely, *Matsumura* v. *County of Hawaii*, 19 Haw. 496; *Halawa Plantation* v. *County of Hawaii*, 22 Haw. 753; *Reinhardt* v. *County of Maui*, 23 Haw. 102; *Perez* v. *City and County of Honolulu*, 29 Haw. 256 and *Cabral* v. *City and County of Honolulu*, 32 Haw. 872. These opinions not only adopt the rule but in some instances the court has attempted to differentiate between cases that fall within the nonliability rule on the one hand and the liability rule on the other.

In the *Perez* case, *supra*, where the immunity doctrine was invoked, the plaintiff was injured as the result of a collision between a police patrol wagon and a fire engine operated by the city and county fire department. The court held that because both the fire and police departments of the city and county were performing governmental functions the municipality was immune from liability. In *Matsumura* v. *County of Hawaii, supra*, immunity was denied where the county was engaged in maintaining and constructing a public highway. This latter doctrine was reaffirmed in the *Cabral* case as well as in the other Hawaiian citations.

The doctrine of immunity is based upon the theory that municipal corporations have a dual character. They are governmental instrumentalities, endowed with powers and duties necessary for the establishment and maintenance of good government within their territory. In the exercise of these powers and the discharge of these duties they are political subdivisions of the state employed by it as a means through which it may perform the duties that it owes to all citizens alike. But they are more than governmental instrumentalities. They are incorporated at the wish and special instance of the inhabitants for the advancement of their own private interests and exercise powers and privileges which are to be exercised for the improvement of the territory within their limits and for its adaptation to the purposes of residence and business. While acting in their capacity as governmental instrumentalities they are, like the sovereign power itself, exempt from liability for acts done or omitted unless such liability is expressly created by statute. On the other hand, when they are acting not in their governmental capacity but in their municipal or corporate capacity, exercising powers and privileges given them for their own corporate benefit, they are held liable for their acts and omissions in exercising these powers.

In *City of Winona* v. *Botzet,* 169 Fed. 321, Judge Sanborn, in an exhaustive opinion, indicates the distinction between the two classes of municipal activities in the following language (p. 332): "A city has two classes of powers, the one legislative, public, in the exercise of which it acts as a political subdivision and delegate of the state and governs its people, the other private, corporate, business, in the exercise of which it acts for the advantage of the inhabitants of the city and of itself as a legal personality." The court then proceeds to say that for the acts and omissions of its officers and agents in the exercise

of the former class, such as police power, the power to erect, maintain and operate a city hall and courthouse, the power through its board of health or other agency to protect its inhabitants against disease and insanitary conditions and to care for the sick, the power to maintain and operate a fire department to protect its inhabitants against conflagrations, the power to promote education, the power to inspect boilers and the power to administer public charities, the city, like the state, is not liable to pay damages in civil suits. But for damages caused by the wrongful acts and omissions of its officers and agents within the scope of their authority in the exercise of its powers of the latter class, such as the power to build and maintain bridges, streets and highways, the power to construct and keep in repair sewers, the power to collect refuse and to care for the dump where it is deposited, the power to operate the draws of bridges, the power to build, maintain and operate waterworks, furnish water to the city and its inhabitants for compensation, the city is liable to the same extent as a private individual or corporation under like circumstances.

An interesting discussion of the question is to be found in the Harvard Law Review, Vol. 34, p. 67, where it is said: "An examination of the cases shows the futility, not to say absurdity, of any such distinction between governmental or public and corporate or private functions for the purpose of predicating tort liability." For a caustic comment on the injustice of the rule, see Yale Law Journal, Vol. 34, p. 250. In an article appearing in the December, 1932, Yale Law Journal, 241, 244, the following comment is to be found: "An overwhelming opinion throughout the world in favor of the assumption of community liability for the torts of public officers may be regarded as representing a growing moral conviction to which the courts should not remain impervious." The

question is dealt with in the recent decision in *Evans* v. *Berry*, 262 N. Y. 61, 186 N. E. 205, where the court states the modern tendency is against the rule of nonliability of municipalities even for the acts of firemen and policemen. (See also *Roumbos* v. *City of Chicago*, 163 N. E. 361; *Missano* v. *Mayor of New York*, 160 N. Y. 123, 54 N. E. 744.)

It is extremely difficult to justify a doctrine which reckons the rights of private property sufficiently sacred to accord to it a constitutional guarantee against taking for public purposes without just compensation and yet permits a municipality by gross negligence to do grievous bodily harm to the individual and escape all liability under the rule of governmental immunity. Regardless, however, of what our opinion of the doctrine may be we feel compelled to follow the precedents established by the Federal Supreme Court and this court, heretofore referred to.

The turning point in this case, therefore, is not whether the rule of governmental immunity is to be recognized but rather whether the defendant, in operating its truck at the time of the injury to plaintiff, was in the performance of a governmental function, as distinguished from activities defined as corporate or ministerial. This presents a problem fraught with great difficulty. There is the utmost lack of harmony among the decisions of the various courts called upon to judicially determine the line to be drawn between what is and what is not a governmental function. The perplexity of the question was recognized by the court in *Harris* v. *District of Columbia, supra,* it saying (p. 652) : "Application of these general principles to the facts of particular cases has occasioned much difficulty." And again, in *Trenton* v. *New Jersey*, 262 U. S. 182, 191, the court says: "The basis of the distinction is difficult to state, and there is no established rule for the determination of what belongs to the one or the other class."

The following are referred to as some of the leading cases involving the doctrine of governmental immunity in damage cases against municipalities indicative of the marked disagreement among the courts as to where the line of demarcation should be drawn: 6 McQuillin Mun. Corp. §2796; *Scibilia* v. *Philadelphia,* 279 Pa. 549; *Scales* v. *City of Winston-Salem,* 189 N. C. 469, 127 S. E. 543; *City of Tuscaloosa* v. *Fitts,* 209 Ala. 635, 96 So. 771; *Jones* v. *City of Phoenix,* 239 Pac. 1030; *Savannah* v. *Jordan,* 142 Ga. 409, 83 S. E. 109; *Cassidy* v. *St. Joseph,* 247 Mo. 197, 152 S. W. 306; *Pittam* v. *City of Riverside,* 16 Pac. (2d) 768; *Manning* v. *City of Pasadena,* 58 Cal. App. 666. For contra view see *Roumbos* v. *City of Chicago,* 332 Ill. 70, 163 N. E. 361; *Foss* v. *City of Lansing,* 237 Mich. 633, 212 N. W. 952; *Missano* v. *Mayor of New York,* 160 N. Y. 123, 54 N. E. 744; *McCleod* v. *City of Duluth,* 174 Minn. 184, 218 N. W. 892; *City of Denver* v. *Porter,* 126 Fed. 288; *Pass Christian* v. *Fernandez,* 56 So. 329; *Consolidated Apartment House Co.* v. *Mayor of Baltimore,* 102 Atl. 920; *Ostrom* v. *City of San Antonio,* 94 Tex. 523, 62 S. W. 909.

*Harris* v. *District of Columbia, supra,* is relied upon by defendant as supporting the principle contended for by it in the present case. The question propounded to the court in that case was: "Is the sprinkling of the streets to keep down dust for the purpose of the comfort and health of the general public, a public or governmental act as contradistinguished from a private or municipal act, which exempts the District of Columbia from liability for the injuries caused by one of its employees engaged therein?" It is to be noted that this question assumes that laying the dust is for the purpose of the comfort *and health* of the general public. This fact being conceded the court answered the question in the affirmative. But the court in the *Harris* case was considering a street cleaning activity while we have here a case involving the removal of rubbish from

private premises. In a later decision by the Federal Su-preme Court, in *Trenton* v. *New Jersey, supra,* the court refers to the rule that a municipality is liable when its acts or omissions occur in the exercise of its power to build and maintain bridges, streets, highways, waterworks, con-struct sewers and *collect refuse and care for the dump where it is deposited.*

The solution in each case must necessarily depend upon its individual facts and circumstances. The nature of the activities determines the classification. We believe con-fusion and misunderstanding have arisen in the present case by the erroneous use of the word garbage, which is defined as "the entrails of an animal or fish; refuse animal or vegetable matter from a kitchen, market or store," sometimes "consisting of offal mixed with other refuse as ashes, paper," etc. The record in this case indicates that the municipal truck at the time of the accident was loaded with tree trimmings, coconut trimmings and hibiscus. One witness described this material as garbage. Another explained that the truck was loaded with branches and hibiscus "and things of that sort." Mr. Hoomano, em-ployed by the city and county as truck dispatcher, testified that the truck was loaded with three tons of all kinds of rubbish, cans, tree trimmings, "anything that's put out to be hauled away." This witness stated explicitly, however, that the truck did not carry wet garbage or kitchen refuse. It also appears from the evidence that the city and county makes a substantial charge for collecting refuse when the same is gathered from the premises of business houses, restaurants, apartments, etc., but that the service is free to home premises. It is of record in the case that for the year ending December 31, 1933, the receipts of the garbage department for the collection of waste materials amounted to $27,913.38. Some courts hold that where there is an in-cidental profit to the municipality in the disposal of gar-

bage the city is deprived of the defense of immunity but here again we are met by a sharp conflict among the authorities. *Foss* v. *City of Lansing,* 237 Mich. 633; *Bodge* v. *Philadelphia,* 167 Pa. 492; but see *Moulton* v. *City of Fargo,* 167 N. W. 717, *James* v. *City of Charlotte,* 112 S. E. 423; *Manning* v. *City of Pasadena,* 58 Cal. App. 666. It is not clear from the record what portion of the rubbish, if any, came from the premises of pay customers of the department.

The defendant in this case relies upon the immunity rule based on the theory that the removal of the rubbish with which the truck was loaded was necessary for the protection and preservation of public health. The burden was upon defendant to establish this issue by evidence. It produced no proof showing or tending to show that the material in question contained any matter which would contaminate the atmosphere or breed pestilence and disease. There is no evidence in the record which would justify us in finding that the removal of the material was necessary as a health measure or that its nonremoval would have been dangerous or deleterious to health and thus the decision in *Harris* v. *District of Columbia, supra,* is not controlling. The material being conveyed in the truck of defendant and as described by the witnesses does not fall within the definition of garbage. It should be classified as rubbish. Its accumulation might have created a fire hazard, a condition which the territorial fire marshal possessed ample authority to remedy under the authority granted him by section 3463, R. L. 1925. It is true there might be an element of health preservation in the removal and disposition of the rubbish in question but it cannot be said that its nonremoval would have *ipso facto* created a condition dangerous to health. The United States circuit court of appeals for the eighth circuit in passing upon this phase of a similar question said: "In

almost all affairs of purely local concern some indirect relation may be traced to a matter of health, safety, or other subject of governmental cognizance. The test is not that of casual or incidental connection. If the duty in question is substantially one of a local or corporate nature, the city cannot escape responsibility for its careful performance because it may in some general way also relate to a function of government." *City of Denver* v. *Porter,* 126 Fed. 288, 293. There is no legal duty on the part of the garbage department of the city and county to remove rubbish from private premises and in doing so it performed no governmental function but merely carried out an arrangement entered into between it and the occupants of private premises which undoubtedly was of mutual benefit alike to it and to them, but involved nevertheless a corporate activity on the part of the city and county which did not concern the people of the Territory residing outside of the limits of the municipality.

We have considered all of the exceptions presented by the defendant. Finding them without merit, the exceptions are overruled.

*P. Silver* (*F. E. Thompson* with him on the brief) for plaintiff.

*W. C. Tsukiyama,* City and County Attorney (also on the briefs), for defendant.